**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| Sharla B. Weaver, | : | Case No. 4:09-CV-2726 |
| Plaintiff, | : | |
| v. | : | **MEMORANDUM DECISION AND ORDER** |
| Commissioner of Social Security, | : | |
| Defendant. | : | |

Plaintiff seeks judicial review, pursuant to 42 U. S. C. § 405(g), of Defendant's final determination denying her claim for Disability Insurance Benefits (DIB) under Title II of the Social Security Act (Act) and for Supplemental Security Income (SSI) under Title XVI of the Act. Pending are the parties' Briefs on the Merits (Docket Nos. 18 & 19). For the reasons that follow, the Commissioner's decision is affirmed.

**I. PROCEDURAL BACKGROUND.**

On August 25, 2003, Plaintiff filed applications for DIB and SSI and a request for a period of disability alleging that she became disabled on January 14, 2003. Both applications were denied initially and upon reconsideration. Plaintiff, represented by counsel, and Lynn Smith, a certified rehabilitation counselor, testified at a hearing before an Administrative Law Judge (ALJ) on August 14, 2006. On September 27, 2006, ALJ Edmund Round issued an unfavorable decision, finding that Plaintiff was not disabled as defined under the Act from January 14, 2003, through September 24, 2006 (Docket No. 14, Exhibit 5, pp. 5-13 of 21).

Plaintiff filed another application for Title XVI benefits on October 5, 2006, alleging that she

became disabled on February 21, 1998 (Docket No. 14, Exhibit 8, pp. 3-11 of 51). Plaintiff filed another application for Title II benefits telephonically on October 23, 2006. The Social Security Administration acknowledged receipt of the application on February 27, 2007. In the Title II application, Plaintiff alleged that she had become disabled on January 14, 2003 (Docket No. 14, Exhibit 8, pp. 36-38 of 51). The applications were denied initially and upon reconsideration (Docket No. 14, Exhibit 6, pp. 2 - 4, 5-7, 11-13, 14-16 of 34).

On March 11, 2009, ALJ James J. Pileggi held a hearing at which Plaintiff, represented by counsel, Vocational Expert (VE) Tania Shullo and Kara Stephens, a Substance Abuse Mental Impairment (SAMI) team leader and counselor at Meridian Services, attended and testified (Docket No. 14, Exhibit 4, pp. 2, 16 of 24). On April 3, 2009, ALJ Pileggi rendered an unfavorable decision, finding that Plaintiff was not disabled under the Act (Docket No. 14, Exhibit 3, pp. 5-21 of 21). On September 18, 2009, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner (Docket No. 14, Exhibit 2, pp. 2-4 of 7). Plaintiff filed a timely complaint in this Court seeking judicial review.

## II. FACTUAL BACKGROUND.

**A.     PLAINTIFF'S TESTIMONY.**

Plaintiff was 51 years of age and had obtained her general equivalency degree. She was divorced, lives alone and has two adult daughters (Docket No. 14, Exhibit 4, pp. 6-7, 13 of 24).

Plaintiff had not been employed during the three years that preceded the hearing, and she received

benefits from the Welfare Department to assist with living expenses. Plaintiff had past work experience that lasted more than three months as a packer (Docket No. 14, Exhibit 4, pp. 7-8 of 24).

Plaintiff had a history of alcohol and cocaine abuse. She had regained sobriety and had not abused either alcohol or cocaine since 2006 except on one occasion (Docket No. 14, Exhibit 4, p. 8 of 24).

The primary source of Plaintiff's problems was her deteriorating mental health. She was undergoing counseling/treatment which included drug therapy (Docket No. 14, Exhibit 4, pp. 9, 10 of 24). Plaintiff continued to have problems even though she complied with the medication regimen. Plaintiff testified that she had fluctuating periods of wanting to sleep constantly, yet also experiencing insomnia. Occasionally she stayed awake for several days consecutively. Occasionally, her mind was filled with sinister, racing thoughts; however, she was not fearful and had not recently had suicidal thoughts. There were also periods during which she was housebound except to attend doctors' appointments and shop for groceries (Docket No. 14, Exhibit 4, pp. 10, 11, 14-15 of 24). Her capacity to remember was unreliable. She could not explain what movies she watched or process what she read. She denied having hallucinations or hearing voices (Docket No. 14, Exhibit 4, pp. 11, 12 of 24). Plaintiff's back and hips problems were exacerbated by anxiety (Docket No. 14, Exhibit 4, p. 9 of 24).

Plaintiff testified that she kept her apartment "looking pretty nice" and most of the time she maintained her personal hygiene. She stated that once her daughter discovered that she had not showered in a week; therefore, her daughter assisted her in showering immediately (Docket No. 14, Exhibit 4, pp. 13-14 of 24). Her daughter visited; otherwise, Plaintiff had few friends; however, she described her ability to get along with others as pretty good. Occasionally she talked with her friends by telephone (Docket No. 14, Exhibit 4, pp, 11, 14 of 24).

**B.  COUNSELOR TESTIMONY**

Kara Stephens, Counselor and team leader at Meridian Services, explained that she had an

ongoing relationship with Plaintiff dating back approximately ten years to December 1999. Ms. Stephens consulted with Plaintiff on a weekly or bi-weekly basis at Plaintiff's apartment since transportation was an issue. The Case Manager visited Plaintiff during the weeks when Ms. Stephens was unable to do so (Docket No. 14, Exhibit 4, pp. 16-17 of 24).

Ms. Stephens stated that she had witnessed Plaintiff's mental health change, as opposed to deteriorate, from depression to mood instability with more of the anxiety or mania. Particularly at the end of 2007, Ms. Stephens witnessed pressured speech, racing thoughts, anxiety and insomnia. She concluded that Plaintiff seemed to meet the criteria for bi-polar disorder. Plaintiff''s psychiatrist agreed and changed her diagnosis (Docket No. 14, Exhibit 4, 17 -18 of 24). Ms. Stephens opined that Plaintiff had not learned how to manage her mood instabilities (Docket No. 14, Exhibit 4, p. 18 of 24). She had gained "a lot of" coping skills and assertiveness, yet Plaintiff continued to have difficulty coping with the day-to-day stressors (Docket No. 14, Exhibit 4, pp. 19, 20 of 24).

Ms. Stephens did note that Plaintiff's depression was exacerbated by chronic pain issues. She opined that Plaintiff's pain intensified when her mental health symptoms surfaced. Ms. Stephens was optimistic that the newly prescribed mood stabilizer would assist Plaintiff in caring for herself and interacting with friends (Docket No. 14, Exhibit 4, p. 21 of 24).

**C.    VE TESTIMONY.**

The VE Tania Shullo testified that her opinions were consistent with the DICTIONARY OF OCCUPATIONAL TITLES (DOT) (Docket No. 14, Exhibit 4, p. 23 of 24). The VE classified Plaintiff's last job of a packer as an unskilled position of the light exertional level. This position required a specific vocational preparation period beyond a short demonstration up to and including one month (Docket No. 14, Exhibit 4, p. 22 of 24; DOT (rev. 4th ed. (1991)).

Assuming a person with no physical limitations, limited to simple repetitive tasks involving routine work processes and settings, no interaction with the public as an integral part of the work, no job stressors such as high quotas or close attention to quality production standards, such a person could perform work as a packer. Plaintiff's last job as a packer involved stuffing pillows in a box. There would be no quality control issues. Plaintiff could return to her prior work (Docket No. 14, Exhibit 4, p. 22 of 24).

The VE explained that if Plaintiff would be unable to report to work or after having reported to work she would have to be absent from the workplace on an irregular or random basis three or more times per month, for several months, she would be unable to do the job of packer or any other job in the national economy. If Plaintiff were off task 10% to 15% of the workday, excluding the normal work breaks and lunch periods, she would be unable to perform the job of packer or any other job in the national economy. If Plaintiff reacted inappropriately to supervision on more than two occasions, she would be unable to work as a packer or another job in the national economy (Docket No. 14, Exhibit 4, p. 23 of 24).

### III. MEDICAL EVIDENCE.

Dr. Nicholas DePizzo diagnosed and treated Plaintiff's countless symptoms from March 15, 1982 through November 20, 2006, including shingles, bronchitis, fibromyalgia, hypercholesterolemia, intractable back pain, low back pain, bilateral hip pain, anxiety, inner ear infection, joint and abdominal pain (Docket No. 14, Exhibit 15, pp. 3-21 and Exhibit 23, pp. 3-15 of 23).

On February 28, 1999, Plaintiff presented to the emergency room at Sharon Regional Health System in Sharon, Pennsylvania, after a suicide attempt (Docket No. 14, Exhibit 11, pp. 2 of 35; 5 of 35; 16 of 35). An array of tests performed on Plaintiff's urine and blood identified traces of cocaine,

5

anti-depressant and anti-inflammatory compounds (Docket No. 14, Exhibit 11, pp. 12 , 13 of 35). The lateral spine x-ray showed no abnormality (Docket No. 14, Exhibit 11, p. 8 of 35).

Diagnosed with depression and some danger of hurting self or others or occasionally failing to maintain minimal personal hygiene or gross impairment in communication, Plaintiff was transferred to Sharon Regional Health Systems' Adult and Adolescent Psychiatry Unit on March 1, 1999 (Docket No. 14, Exhibit 11, p. 16, 27 of 35). On March 2, 1999, Plaintiff's diagnosis was upgraded to major depression, recurrent and cocaine dependence. During the course of her stay, medications were administered to treat depression, pain, persistent agitation, indigestion and constipation (Docket No. 14, Exhibit 12, pp. 2, 9, 10 of 18). Plaintiff was discharged on March 5, 1999 with medication designed to treat depression (Docket No. 14, Exhibit 12, p. 3-4 of 18).

On December 7, 1999, Plaintiff was admitted to a non-intensive outpatient program to assist with maintenance of sobriety through SAMI. The plan designed to effectuate this goal included a community support program, counseling and medication (Docket No. 14, Exhibit 17, p. 10 of 40). Plaintiff participated intently in the psychotherapy services from January 8, 2004 through August 30, 2006 (Docket No. 14, Exhibit 17, p. 7 of 40; Exhibit 18, pp. 2-27 of 27; Exhibit 19, pp. 2-23 of 23; Exhibit 20, pp. 2-26 of 26; Exhibit 21, pp. 2-32 of 32; and Exhibit 22, pp. 2-12 of 12).

On August 12, 2001, no acute abnormalities were discovered in Plaintiff's abdominal cavity. Possible cysts were noted in the right ovary; otherwise, the computed tomography (CT) scan of the pelvis was normal (Docket No. 14, Exhibit 16, p. 23 of 23).

A moderate sized calcaneal spur was noted in Plaintiff's right foot on October 8, 2001 (Docket No. 14, Exhibit 16, p. 22 of 23).

The chest X-ray administered on or about January 16, 2002, showed a normal chest (Docket No.

14, Exhibit 16, p. 21 of 23).

On May 19, 2003, Plaintiff presented to Forum Health with signs of depression and suicidal ideations (Docket No. 14, Exhibit 14 p. 3 of 5).

Plaintiff was treated at Forum Health for severe mid-back pain on February 17, 2005 (Docket No. 14, Exhibit 13, p. 2 of 28). The results from the diagnostic imaging of Plaintiff's chest were normal (Docket No. 14, Exhibit 13, p. 9 of 28).

Results from the CT scan of Plaintiff's abdomen and pelvis that was administered on May 5, 2005 showed probable benign slight enlargement of the left adrenal gland (Docket No. 14, Exhibit 23, p. 21 of 23).

Plaintiff was treated at Forum Health for right side pain on April 25, 2005 (Docket No. 14, Exhibit 13, p. 10 of 28). To isolate the source of the pain, several tests were administered. X-rays of Plaintiff's abdomen and chest showed unremarkable results (Docket No. 14, Exhibit 13, pp. 17, 18 of 28).

The magnetic resonance imaging (MRI) of Plaintiff's hips administered on September 16, 2005, showed bony hypertrophy and joint space narrowing of the right hip. Mild symmetrical osteoarthitic changes were evidenced in the left hip when compared to the right. There was no acute fracture, dislocation or bony destruction apparent in either hip (Docket No. 14, Exhibit 16, p. 18 of 23).

Dr. Elizabeth Myer administered an electromyography/nerve conduction (EMG/NC) study on October 18, 2005. She interpreted the results, finding that they were within a normal range (Docket No. 14, Exhibit 23, p. 16 of 23).

On August 1, 2006, Dr. DePizzo confirmed that Plaintiff had hyperlipidemia, anxiety, chronic pain and hyperglycemia (Docket No. 14, Exhibit 17, p. 19 of 40). Given these medical conditions,

Plaintiff could only sit continuously for two hours, stand continuously for one hour and walk continuously for twenty minutes. During an entire eight-hour workday, Plaintiff could only sit for six hours, stand for one hour and walk for one hour (Docket No. 14, Exhibit 17, p. 20 of 40). Dr. DePizzo opined that Plaintiff could frequently lift up to five pounds, occasionally lift up to ten pounds, occasionally carry up to ten pounds and frequently carry up to ten pounds (Docket No. 14, Exhibit 17, p. 21 of 40).

Dr. Michael Bengala issued the clinical and test findings of Plaintiff's current mental status on July 28, 2006, noting that without her medication, Plaintiff relapsed to despondency with suicidal thinking (Docket No. 14, Exhibit 17, p. 25 of 40). In assessing her functional limitations, Dr. Bengala found that Plaintiff had moderate limitations in the restriction of activities of daily living, difficulties in maintaining social functioning and deficiencies of concentration, persistence or pace (Docket No. 14, Exhibit 17, pp. 26-27 of 40).

Plaintiff commenced treatment at the Mahoning County Chemical Dependency program in 1999. She resided in a transitional housing program before moving in September 2000 to Meridian Services, a holistic service provider that addresses addiction and mental health disorders (Docket No. 14, Exhibit 25, p. 3 of 32). The counseling/psychotherapy continued through December 23, 2008, with an emphasis on relapse prevention. During the course of treatment, Plaintiff focused on anger management. To achieve this goal the counselor concentrated on assisting Plaintiff with the familial and relationship stressors (Docket No. 14, Exhibit 25, p. 11 of 32; Exhibit 26, p. 2 of 13; Exhibit 28, pp. 4-23 of 23; Exhibit 29, pp. 2-23 of 23; Exhibit 30, pp. 2-22 of 22; Exhibit 31, pp. 2-8 of 26). Dr. Michael C. Bengala prescribed an antidepressant, anticonvulsant and sleep aid to compliment counseling. Unless consumed with pain, Plaintiff's mood was generally neutralized and her affect was stable when she took

the cocktail of medications prescribed by Dr. Bengala (Docket No. 14, Exhibit 25, p. 6 of 32; Exhibit 27, pp. 5-18 of 18).

On February 9, 2007, Donald Degli, M.A., a psychologist, conducted a clinical evaluation. He diagnosed Plaintiff with recurrent major depression, personality disorder not otherwise specified, isolated psychosocial stressors and moderate symptoms or moderate difficulty in social, occupational or school functioning. He attributed a moderate impairment to Plaintiff in her ability to meet the demands of competitive adult employment (Docket No. 14, Exhibit 24, p. 4 of 38).

Dr. Dariush Saghafi, M. D., diagnosed Plaintiff with morbid obesity on February 22, 2007. Although she complained of back pain there was no medically oriented deficit found upon examination. It was Dr. Saghafi's opinion that Plaintiff could lift, push, pull up to twenty-five pounds, bend, walk and stand for up to twenty minutes at a time, understand the environment and her peers as well as communicate satisfactorily (Docket No. 14, Exhibit 24, p. 8 of 38). Plaintiff could raise her shoulders, elbows, wrists, fingers, hips, knees, feet and great toes against the maximum resistence. Plaintiff's ability to grasp, manipulate, pinch and engage in fine coordination was normal (Docket No. 14, Exhibit 24, p. 9 of 38). Similarly, the range of motion in Plaintiff's cervical spine, shoulders, elbows, wrists, hands/fingers, dorsolumbar spine, hips, knees and ankles was within the normal range (Docket No. 14, Exhibit 24, pp. 10-11 of 38).

On February 26, 2007, Dr. Catherine Flynn, Psy. D., diagnosed Plaintiff with recurrent major depression and a personality disorder. She determined that Plaintiff had moderate limitations in the ability to understand and remember detailed instructions, carry out detailed instructions, complete a normal workweek and workday without interruptions from psychologically based symptoms, interact appropriately with the general public, accept instructions and respond appropriately to criticism and

respond appropriately to changes in the work setting (Docket No. 14, Exhibit 24, pp. 12-13 of 38). Plaintiff had a moderate degree of restriction of activities of daily living, difficulties maintaining social functioning and difficulties maintaining concentration, persistence or pace. Dr. Flynn documented one or two episodes of decompensation to Plaintiff's mental health (Docket No. 14, Exhibit 24, p. 26 of 38).

Dr. William Jerry McCloud, M. D., determined on March 17, 2007, that Plaintiff should never climb using a ladder/rope/scaffold but she could occasionally lift and/or carry up to twenty pounds, frequently lift and/or carry up to ten pounds, stand and/or walk about six hours in an eight-hour workday, sit about six hours in an eight-hour workday, engage in unlimited pushing and/or pulling, occasionally climb using a ramp/stairs, stoop, kneel, crouch and crawl (Docket No. 14, Exhibit 24, pp. 31, 32 of 38).

On April 30, 2007, Plaintiff was evaluated for physical therapy to address the mid-back pain (Docket No. 14, Exhibit 26, pp. 6-7 of 13). The physical therapist certified on June 25, 2007, that as Plaintiff's stress increased so did her neck pain. Plaintiff's shoulder pain had not responded to therapeutic exercise (Docket No. 14, Exhibit 26, p. 12 of 13). At the conclusion of eight treatments, Plaintiff felt good and only had pain when "painting" overhead (Docket No. 14, Exhibit 26, p. 13 of 13).

On January 18, 2008, Dr. Vincent Paolone, M. D., a psychiatrist at Meridian, opined that Plaintiff had a bipolar disorder. Plaintiff continued to take an antidepressant, anticonvulsant and sleep aid medications (Docket No. 14, Exhibit 31, p. 26 of 26). Another psychiatrist at Meridian, Dr. Steven A. King, determined on February 20, 2009, that Plaintiff's bipolar disorder was not stable (Docket No. 14, Exhibit 31, p. 20 of 26).

Beginning December 16, 2008, Plaintiff consulted with Dr. Richard Kalapos about a rash, ear pain, tobacco abuse and hypolipidemia. Through a series of evaluations, Dr. Kalapos discovered that

10

Plaintiff had uncontrolled blood glucose and he ordered glucose monitoring and glucose monitoring education (Docket No. 14, Exhibit 31, pp. 10-18 of 26).

### IV. STEPS TO ENTITLEMENT TO SOCIAL SECURITY BENEFITS.

DIB and SSI are available only for those who have a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007) (*citing* 42 U.S.C. § 423(a), (d); See also 20 C.F.R. § 416.920)). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* (*citing* 42 U.S.C. § 423(d)(1)(A) (definition used in the DIB context); See also 20 C.F.R. § 416.905(a) (same definition used in the SSI context)).

The Commissioner's regulations governing the evaluation of disability for DIB and SSI are identical for purposes of this case, and are found at 20 C.F.R. § 404.1520, and 20 C.F.R. § 416.920 respectively. To assist clarity, the remainder of this decision references only the DIB regulations, except where otherwise necessary.

To determine disability under Sections 404.1520 and 416.920, a plaintiff must first demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits. *Id.* (*citing Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)).

Second, plaintiff must show that she suffers from a "severe impairment" in order to warrant a finding of disability. *Id.* A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Id.*

Third, if plaintiff is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, plaintiff is

11

presumed to be disabled regardless of age, education or work experience. *Id*.

Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, plaintiff is not disabled. *Id.*

For the fifth and final step, even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that plaintiff can perform, plaintiff is not disabled. *Id*. (*citing Heston v. Commissioner of Social Security*, 245 F.3d 528, 534 (6th Cir. 2001)(internal citations omitted) (second alteration in original)). If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates. *Id*. (*citing* 20 C.F.R. § 404.1520(a)(4); 20 C.F.R. § 416.920(a)(4)).

## V. THE ALJ'S FINDINGS.

Upon consideration of the evidence, the ALJ made the following findings:

1. Plaintiff met the insured status requirements of the Act through March 31, 2008. Plaintiff had not engaged in substantial gainful activity since September 28, 2006, the day after the prior decision.

2. Plaintiff had the following severe impairments: depression and anxiety. Plaintiff is morbidly obese and has a history of polysubstance abuse. Plaintiff did not have an impairment or combination of impairments that met or medically equaled on of the listed impairments in 20 C. F. R. Part 404, Subpart P, Appendix 1.

3. Plaintiff had the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations: Plaintiff was limited to a simple, repetitive, routine work process and setting. She could not have interaction with the public. The work could not be high stress, no high quotas or close attention to quality production standards.

4. Plaintiff was capable of performing past relevant work as a packer. This work did not require the performance of work related activities precluded by Plaintiff's residual functional capacity.

5. Plaintiff was not disabled under the Act from September 28, 2006, through April 3, 2009, the date of the decision.

12

(Docket No. 14, Exhibit 3, pp. 5-21 of 21).

## VI. STANDARD OF REVIEW.

Title 42 U.S.C. § 405(g) permits the district court to conduct judicial review over the final decision of the Commissioner. *McClanahan v. Commissioner of Social Security,* 474 F.3d 830, 832-833 (6th Cir. 2006). Judicial review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *Elam ex rel. Golay v. Commissioner of Social Security*, 348 F.3d 124, 125 (6th Cir. 2003) (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

This Court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. *Longworth v. Commissioner Social Security Administration*, 402 F.3d 591, 595 (6th Cir. 2005) (*citing Warner v. Commissioner of Social Security,* 375 F.3d 387, 390 (6th Cir.2004) (*quoting Walters v. Commissioner of Social Security,* 127 F.3d 525, 528 (6th Cir. 1997)). Substantial evidence is defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Commissioner of Social Security*, 486 F.3d 234, 241 (6th Cir. 2007).

In deciding whether to affirm the Commissioner's decision, it is not necessary that the court agree with the Commissioner's finding, as long as it is substantially supported in the record. *Id.* (*citing Her v. Commissioner of Social Security,* 203 F.3d 388, 389-90 (6th Cir. 1999)). The substantial evidence standard is met if a "reasonable mind might accept the relevant evidence as adequate to support a conclusion." *Longworth, supra,* 402 F. 3d at 595 (*citing Warner, supra*, 375 F.3d at 390) (*citing Kirk v. Secretary of Health & Human Services,* 667 F.2d 524, 535 (6th Cir. 1981) *cert. denied*, 103 S. Ct. 2478

13

(1983) (internal quotation marks omitted)). If substantial evidence supports the Commissioner's decision, this Court will defer to that finding "even if there is substantial evidence in the record that would have supported an opposite conclusion." *Id.* (*citing Warner,* 375 F.3d at 390) (*quoting Key v. Callahan,* 109 F.3d 270, 273 (6th Cir. 1997)).

### VII. DISCUSSION.

Plaintiff's sole argument is that the ALJ failed to give controlling weight to the treatment received from the staff at Meridian Services. Plaintiff considers the physicians and counselors at Meridian treating sources.

In assessing the medical evidence supporting a claim for disability benefits, the ALJ is required to give greater deference to the opinions of treating physicians than to the opinions of non-treating physicians because "these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." *Blakley v. Commissioner of Social Security*, 581 F.3d 399, 406 (6th Cir. 2009) (*citing Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004) (*quoting* 20 C.F.R. § 404.1527(d)(2)). The ALJ "must" give a treating source opinion controlling weight if the treating source opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "not inconsistent with the other substantial evidence in [the] case record." *Id.* (*citing Wilson*, 378 F.3d at 544 (*quoting* 20 C.F.R. § 404.1527(d)(2)). If the ALJ does not accord controlling weight to a treating physician, the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of the treatment relationship and the frequency of examination, the nature

and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician. *Id.* (*citing Wilson,* 378 F.3d at 544; *see also* 20 C.F.R. § 404.1527(d)(2)).

Closely associated with the treating physician rule, the regulations require the ALJ to "always give good reasons in [the] notice of determination or decision for the weight" given to the claimant's treating source's opinion. *Id.* (*citing* 20 C.F.R. § 404.1527(d)(2)). Those good reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* at 406-407 (*citing* SOC. SEC. RUL. 96-2p, 1996 WL 374188, at *5). Because the reason-giving requirement exists to "ensur[e] that each denied claimant receives fair process," the courts have held that an ALJ's "failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight" given " *denotes a lack of substantial evidence,* even where the conclusion of the ALJ may be justified based upon the record." *Id.* (*citing Rogers v. Commissioner of Social Security,* 486 F.3d 234, 243 (6th Cir. 2007) (emphasis added)).

The Magistrate has reviewed the medical records of Meridian Services in their entirety as well as the ALJ's decision (Docket No. 14, Exhibit 3, pp. 12-14 of 21; Exhibit 25, pp. 6-32 of 32; Exhibit 26, p. 2 of 13; Exhibit 27, p. 5-18 of 18; Exhibit 28, pp. 3-23 of 23; Exhibit 29, pp. 2-23 of 23; Exhibit 30, pp. 2-22 of 22; Exhibit 31, pp. 2-8 of 26, 20-26 of 26; Exhibit 32, p. 7-16 of 16). The ALJ gave substantial deference to the treatment provided by Meridian, in particular the conclusions of Dr. Paolone. Appointments with the psychiatrists and counselors at Meridian were documented with copious progress notes consisting of recitations of Plaintiff's subjective complaints and responses to

15

various questions, the observations made by the various psychiatrists and the treating psychiatrist's impressions and recommendations. Dr. Paolone acknowledged that Plaintiff suffered from depression. However, it was Dr. Paolone's opinion that if Plaintiff continued on the prescribed medication regimen, she was making progress. Similarly, Dr. King found little by way of abnormal findings.

The counselors recounted thoroughly the therapeutic intervention provided. Typically the therapeutic intervention consisted of advice given by the counselor and Plaintiff's response. The counselors documented the relative changes in Plaintiff's condition at each visit. They, too, found that Plaintiff had made progress in learning to manage her mental health symptoms. The ALJ gave substantial deference to these findings.

Here, the ALJ favored the opinions of Dr. Paolone and the Meridian counselors. The ALJ adequately explained the weight given to these opinions. This Court must affirm the Commissioner's conclusions since the Commissioner applied the correct legal standards and made findings of fact supported by substantial evidence in the record.

## VIII. CONCLUSION

Based on the foregoing, the Commissioner's decision is affirmed.

**IT IS SO ORDERED.**

/s/ Vernelis K. Armstrong
United States Magistrate Judge

Dated: March 11, 2011